**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TOKA, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 2:26-cv-00414 |
| v. | ) |
| | ) Chief Judge Cathy Bissoon |
| SCHEDULE A DEFENDANTS, | ) |
| | ) |
| Defendants. | ) |

---

**APPEARING DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE AND
OPPOSITION TO ENTRY OF PRELIMINARY INJUNCTION**

**I. PRELIMINARY STATEMENT**

**Plaintiff froze the businesses of these sellers using evidence drawn from products Plaintiff never tied to them, advertisements they never published, and claims they never uttered.** That single sentence captures why the requested preliminary injunction must be denied as to the Appearing Defendants -- Casesmile (No. 11), Haodsso Direct (No. 27), Yueshao (No. 76), and Beeyong (No. 116) (collectively, the "Appearing Defendants").

This is a "Schedule A" case. Plaintiff sued 136 unrelated online sellers in a single complaint, obtained a sealed *ex parte* temporary restraining order freezing every defendant's storefront and funds, and supported that extraordinary relief with a five-page, twelve-paragraph investigator declaration (the Declaration of Dee Odell) that never once distinguishes one defendant from another. *See* Declaration of Dee Odell ("Odell Decl.")(Doc.12, at ¶¶ 6–11). Plaintiff's memorandum rests on two independent bodies of law. It first asserts that the Appearing Defendants infringe two patents-in-suit — U.S. Design Patent No. D1,006,758 (the '758 design patent) and U.S. Patent No. 12,155,158 (the '158 utility patent). It then advances four

accusations of literal falsity under Section 43(a) of the Lanham Act: that the Appearing Defendants (1) sell Plaintiff's product by using Plaintiff's images; (2) falsely claim the entirety of their outlet extenders comply with UL standards; (3) falsely claim ETL certification; and (4) falsely claim a functional grounded plug. As shown below, Plaintiff pleaded only one of those four theories -- the UL theory -- against the Appearing Defendants, and it supported even that theory with no evidence about their products.

Plaintiff's motion fails for three independent reasons. *First*, Plaintiff cannot show a likelihood of success on its patent infringement claims: the Appearing Defendants' accused products do not infringe either the '758 design patent or the '158 utility patent, and both patents-in-suit are, in any event, of dubious validity -- so Plaintiff's infringement claim cannot *likely withstand* the invalidity defense, as it must to support an injunction. *Second*, Plaintiff cannot carry its burden to show a likelihood of success on its false-advertising claims against *these* defendants, because the record contains no evidence that any Appearing Defendant made any of the four challenged representations. *Third*, Plaintiff cannot show irreparable harm, because its asserted injuries are either ordinary economic losses—lost sales and price erosion—compensable in money, or unsupported assertions of goodwill harm not tied to any Appearing Defendant. Plaintiff also cannot trace any alleged injury to these four sellers, and its own months-long delay in seeking relief negates any claim of urgency.

Two further points frame this Opposition. *First*, the manner in which Plaintiff obtained this relief -- securing an *ex parte* freeze against sellers it knew were represented by counsel, while withholding that fact from the Court -- is the subject of the Appearing Defendants' Motion for an Order to Show Cause and for Sanctions, filed June 5, 2026 (Dkt. 35), and is not re-argued here. *Second*, and as developed below, Plaintiff pleaded only one of its theories against the Appearing

2

Defendants and supported even that one with no evidence about their products. The Appearing Defendants ask the Court to deny the injunction, dissolve the restraint as to them, address the inadequacy of the $5,000 security, and preserve their right to recover the costs and damages the wrongful restraint is causing.

## II. STATEMENT OF RELEVANT FACTS

### A. Plaintiff's Product and the Four Challenged Representations.

Plaintiff sells a single-outlet "EZ OUTLET®" extender. Its memorandum asserts that the Schedule A defendants, as an undifferentiated group, (1) advertise their products using Plaintiff's images; (2) mark the "entirety" of their outlet extenders as complying with UL standards when only a plug "pigtail" component is tested; (3) advertise ETL certification their products lack; and (4) advertise a "functional grounded plug" on products that in fact carry only two wires and no ground conductor. Mem. at 33–36; *see also* Odell Decl. ¶¶ 8–11.

### B. The Odell Declaration Does Not Identify Which Defendant Sold Which Product.

Plaintiff's entire false-advertising showing rests on the five substantive paragraphs of the Odell Declaration. That declaration sorts the accused goods into three "types" and then makes group-wide assertions about them. Critically, it concedes that the investigator did *not* find the alleged grounding defect across the board: as to "Type 3" products, the declaration states only that a "significant majority" -- not all -- lacked a connected ground, Odell Decl. ¶ 8, and it never states which seller's product was "Type 1," "Type 2," or "Type 3." The declaration does not name a single Appearing Defendant, does not attach a single Appearing Defendant's listing, and does not tie any of the four challenged representations to any Appearing Defendant's storefront.

### C. The Appearing Defendants' Actual Listings Make None of the Four Representations.

The Appearing Defendants' own product listings -- the very listings Plaintiff captured and produced -- refute each theory. The listings advertise a multi-outlet, USB-equipped power strip sold under the sellers' own brand. They display the sellers' own product photographs, not Plaintiff's. They contain no "ETL certified" claim. They contain no "UL certified" claim. A representative listing is reproduced as **Exhibit A**. (Store Yueshao sells model 0069, while Haodsso Direct, casesmile, and Beeyong sell model 0056.)

## III. LEGAL STANDARD

To obtain a preliminary injunction the moving party must show as a prerequisite (1) a likelihood of success on the merits, (2) that it will suffer irreparable harm absent relief, (3) that the balance of equities favors it, and (4) that an injunction serves the public interest. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). The first two factors are "gateway factors": a movant who fails to establish either a likelihood of success or irreparable harm is not entitled to relief, regardless of the remaining factors. *Id.* at 179. The burden rests on the movant at all times, and the standard is no lower because the relief is sought against multiple defendants in a single action: Plaintiff must make the required showing as to *each* defendant it seeks to enjoin.

## IV. ARGUMENT

**A. Plaintiff Cannot Show a Likelihood of Success on Its Patent Infringement Claims.**

*1.   The Accused Products Do Not Infringe Either Patent-in-Suit.*

Defendants submit herewith the declaration of James B. Babcock, an expert in mechanical engineering and in the field of the patents-in-suit.  Ex. B at ¶¶1-15, 24-28.  Mr. Babcock explains why Defendants' Accused Products do not infringe either the '158 Patent or the '758 Patent.

Mr. Babcock explains that the Accused Products have two different designs, which he refers to as Design 1 and Design 2.  Ex. B at ¶¶ 45-53.  An exemplary photo of Design 1 and an

exemplary photo of Design 2 are included below:




|  |  |
|---|---|
| Design 1 | Design 2 |

*Id.*  Design 1 does not have an extendable shaft and its plug portion does not turn in the housing. Design 2 is extendable, and while its plug portion rotates in the housing, it only rotates 180 degrees.  Neither Design 1 nor Design 2 has wireless charging capabilities.

### *(1) The Accused Products Do Not Infringe the '158 Utility Patent.*

With respect to the '158 Patent, Mr. Babcock addresses each of the two independent claims for each of the two Designs illustrated above.  Ex. B at ¶¶ 54-78.  Based on his review of the prosecution file histories, Mr. Babcock concludes that at least at this preliminary stage, no claim construction other than "plain and ordinary meaning" is necessary.  Ex. B at ¶¶ 42-44.

In particular, with regard to claim 1 of the '158 Patent, Mr. Babcock explains that the Design 1 products lack the required "extendable shaft positioned between the plug end and the outlet end, wherein the plug end is rotatable."  Ex. B at ¶¶ 58-59.  He explains that the shaft of

that design is modular, not extendable, meaning and that the plug end is not rotatable because it is fixed in its housing.

He also explains that due to the modular design, with rigid parts plugging directly into other rigid parts, there is no "electrical cord portion positioned between the extendable shaft and the plug end" "bend collar configured to enable flexibility in the extendable shaft adjacent to the plug end" in the Design 1 products. Ex. B at ¶¶ 60-61. He explains that without having flexibility or bendability between the parts, these limitations cannot be met. *Id*.

Finally, Mr. Babcock explains that there is no infringement under the doctrine of equivalents. Ex. B at ¶ 62.

With regard to claim 12, Mr. Babcock similarly explains that the Design 1 products lack "an extendable shaft that comprises a bend collar is telescopic and rotatable about the plug up to 360°" and an "an electrical cord portion positioned between the extendable shaft and the plug end" for similar reasons as with claim 1. Ex. B at ¶¶ 63, 65. He also explains that the requirement in claim 12 for "an interchangeable faceplate selectively attached with the one or more outlet receptacles" is plainly lacking in the Design 1 products. Ex. B at ¶ 64. Finally, he explains that the Design 1 products do not have any wireless charging capability, and thus cannot meet the claim 12 requirement for "a device cradle that includes wireless charging technology configured to hold a device and facilitate charging the device." Ex. B at ¶ 66. Mr. Babcock concludes, therefore, that the Accused Products having Design 1 do not infringe the '158 Patent.

With regard to claim 1 of the '158 Patent, Mr. Babcock explains that the Design 2 products lack an "electrical cord portion positioned between the extendable shaft and the plug end" "bend collar configured to enable flexibility in the extendable shaft adjacent to the plug end" in the Design 1 products. Ex. B at ¶¶ 69-70. He explains that without having flexibility or bendability

between the parts, these limitations cannot be met; since in Design 2 the outlet end, shaft, and plug end do not move relative to one another, they cannot meet these limitations of claim 1. *Id*.

Mr. Babcock also explains that for the Design 2 products, there is nothing shipped with the products that permits the outlet end to be affixed to the wall (e.g., adhesive pads or screws). Ex. B at ¶ 71. For similar reasons, the Design 2 products do not include "one or more outlet receptacles connected to the shaft that are selectively attachable to a position on a wall." Ex. B at ¶ 74. Thus, the Design 2 products cannot meet the requirement of claim 1 for "an engagement portion, wherein the engagement portion is positioned on a wall-facing side of the outlet end and is configured to selectively engage the wall." *Id.*

Mr. Babcock once again explains that the Design 2 products do not infringe claim 1 under the doctrine of equivalents. Ex. B at ¶ 72.

With regard to claim 12, Mr. Babcock similarly explains that the Design 2 products lack "an extendable shaft that comprises a bend collar is telescopic and rotatable about the plug up to 360°" because, for these products, the plug only rotates 180°. Ex. B at ¶ 73. There is also nothing in the Design 2 products that satisfies the "bend collar" requirement. *Id.*

Mr. Babcock explains that the Design 2 products lack an "an electrical cord portion positioned between the extendable shaft and the plug end" for similar reasons as with claim 1. Ex. B at ¶¶ 76. He also explains that the requirement in claim 12 for "an interchangeable faceplate selectively attached with the one or more outlet receptacles" is plainly lacking in the Design 2 products, which do not have a replaceable face plate at all. Ex. B at ¶ 75. Finally, he explains that the Design 2 products do not have any wireless charging capability, and thus cannot meet the claim 12 requirement for "a device cradle that includes wireless charging technology configured to hold a device and facilitate charging the device." Ex. B at ¶ 77. Mr. Babcock

7

concludes, therefore, that the Accused Products having Design 2 do not infringe the '158 Patent. Ex. B at ¶ 78.

### *(2) The Accused Products Do Not Infringe the '758 Design Patent.*

Mr. Babcock also opines as to why the Accused Products do not infringe the '758 Patent when viewed from the perspective of an "ordinary observer." Ex. B at ¶¶ 79-100.

With regard to Design 1, Mr. Babcock explains that these products do not look substantially identical to the '758 Patent's drawings to an ordinary observer because they do not have the "neck" or "sheath" illustrated just below the outlet portion of the device. Ex. B at ¶ 82. He also explains that the outlet portion itself is drastically different than what is illustrated: it is flat, not curved or bowed (Ex. B at ¶¶ 83-86), and explains that the dimensions of the wall outlet portion of the Design 1 products are substantially different to an ordinary observer (Ex. B at ¶¶ 87-88). He illustrates these differences with a side-by-side comparison of the Design 1 faceplate with the drawings of the '758 Patent, and concludes that there is no infringement by Design 1 of the '758 Patent:

  

Ex. B at ¶¶ 89-90.

With regard to the Accused Products having Design 2, Mr. Babcock again notes the lack of

the "neck" or "sheath" as a substantial difference to an ordinary observer.  Ex. B at ¶ 92.  And he again opines that the wall outlet portion is substantially different because it is flat, not curved (Ex. B at ¶¶ 93-96) and because the dimensions are more akin to an extension cord than a wall outlet/plug (Ex. B at ¶¶ 97-98).  Mr. Babcock again includes a side-by-side comparison of the Design 2 wall outlet portion with the corresponding portion of the patent drawings, and concludes that the Design 2 products do not infringe the '758 Patent:



Ex. B at ¶¶ 99-100.

For the preceding reasons, the Plaintiff is not likely to succeed on the merits of its patent infringement claim, and the Motion should be denied on that basis.

### 2.  Both Patents-in-Suit Are of Dubious Validity.

At the preliminary injunction stage, the question this Court must answer is whether there is a "likelihood of success on the merits" of Plaintiff's patent infringement claim. With respect to a defense of obviousness, Plaintiff must show is that its infringement claim "will likely withstand" Plaintiff's invalidity defense. *Amazon.com v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).  If Defendants raise "a substantial question concerning" validity, i.e., it asserts an invalidity defense that Plaintiff cannot prove "lacks substantial merit," the preliminary

injunction should not issue. *Id.* at 1350–51.

**(1) The '758 *Design* Patent Is Likely Invalid as Obvious.**

The '758 Patent, whose scope is limited to the shaft portion and the shape of the (curved) faceplate, is of dubious validity. In particular, U.S. Patent No. D359,722, published on June 27, 1995 (Ex. C) discloses the shape of an outlet at the top of a shaft with a neck portion, as is claimed in the '758 Patent. EU0021430730003S, published on November 27, 2012 (Ex. D) and US Publication No. 2014/0024247, published on January 23, 2014 (Ex. E) each shows that it was known, in the prior art time frame, to use a rounded design for the area surrounding a wall outlet. Thus, the combination of these references renders the '758 Patent invalid as obvious, and at least presents a substantial question as to the validity of the '758 Patent.

Any argument to the contrary emphasizes the importance of the features of the '758 Patent that are not present in the Accused Products (e.g., the "neck" or "sheath" between the shaft and the wall outlet), and confirms even further the non-infringement positions articulated above.

| D359,722 (June 27, 1995) | EU0021430730003S (November 27, 2012) | US 2014/0024247 (January 23, 2014) |
|---|---|---|
|  | | |

**(2) The '158 Utility Patent Is Likely Invalid as Obvious.**

10

The '158 Patent is likewise of dubious validity, and the following claim charts present a substantial question as to the validity of independent claims 1 and 12 based on U.S Patent Publication No. 2020/0328568 to Greer, filed on November 28, 2019 ("Greer," Ex. F) in view of 2019/0027953 to Rohmer, published on January 24, 2019 ("Rohmer," Ex. G).

| '158 Patent – Claim Language | Greer and Rohmer |
|---|---|
| 1[a]. A wall outlet extender comprising: | The illustrated device in Greer is a wall outlet extender. |
| 1[b] a plug end configured to selectively plug into a wall outlet; | The plug end (comprised of items 3 and 8 above) is configured to selectively plug into a wall outlet. |

11

| '158 Patent – Claim Language | Greer and Rohmer |
|---|---|
| 1[c] an outlet end configured to selectively receive one or more plugs; |  The outlet end (comprised of items 2 and 9) of Greer is an outlet end configured to selectively receive one or more plugs. |
| 1[d] an extendable shaft positioned between the plug end and the outlet end, wherein the plug end is rotatable; | The shaft of Greer is extendable in the above figures, as indicated by item 4: "The device may also have one or a combination of the following : a portion (4) of the (1) body may be adjustable in length and shape." Greer ¶ 4.  In addition, the plug end 8 of Greer is rotatable: "The (8) rotating male end may rotate inside of the (1) to allow horizontal movement along a surface. The (9) rotating access point may rotate inside of the (1) body to allow a traditional vertical alignment of the access point." Greer ¶ 5. |
| 1[e] an electrical cord portion positioned between the extendable | Embodiments disclosed in Greer make clear that an electrical cord portion may be positioned between the |

| '158 Patent – Claim Language | Greer and Rohmer |
|---|---|
| shaft and the plug end, | extendable shaft and the plug end:<br><br>[0004]   The device may also have one or a combination of the following: a portion (4) of the (1) body may be adjustable in length and shape. The intent is to allow the (1) body to form to alternate dimensions to accommodate the user. These possibilities include, but in no way limit the scope of methods possible, by utilizing a telescoping type construction, by utilizing a flexible material that allows pliability, a sliding electrical contact system and/or by utilizing a swivel point that allows directional change. The body may be a combination of a solid component and a portion of an electrical cord. The body may be one solid shape. It may be one solid cast piece with no moving parts. Again, the intent is to provide alternative sizes and shapes to aid in access.<br><br>Greer ¶ 4. |
| 1[f] wherein the extendable shaft comprises a bend collar configured to enable flexibility in the extendable shaft adjacent to the plug end; and | The reference in Paragraph 4 of Greer to a "flexible material that allows pliability" discloses the use of a "bend collar configured to enable flexibility in the extendable shaft at adjacent to the plug end" as is required by this claim limitation.  Greer ¶ 4. |
| 1[g] an engagement portion, wherein the engagement portion is positioned on a wall-facing side of the outlet end and is configured to selectively engage the wall. | Paragraph 12 of Greer makes clear that the disclosed device includes an engagement portion, wherein the engagement portion is positioned on a wall-facing side of the outlet end and is configured to selectively engage the wall:<br><br>[0012]   The (1) body, (2) access point or (3) male end may have a means to attach to a structure, furniture, receptacle or electrical device. The goal is to be able to secure the device in place. This may include (5) holes molded or otherwise created into the (1) body; (2) access point or (3) male end for a fastener to fit through; or an adhesive applied to the device's structure that bonds this device to a wall or cabinet. This may also include attachment points (6) anchored to or molded into the (1) body for the purpose of allowing attachment to another object; the (6) attachment point can be located in any location on the (1) body. This may also include Clips, snaps, hook and loop systems, screws, nails, adhesives. Again, the goal of the attachment point is to further secure the device in place.<br><br>Greer ¶ 12. |
| 12. An extendable power outlet adaptor, comprising: | For the same reasons given above with respect to Claim 1[a], this limitation is met by Greer. |

| '158 Patent – Claim Language | Greer and Rohmer |
|---|---|
| a plug selectively configured to insert into a wall outlet; | For the same reasons given above with respect to Claim 1[b], this limitation is met by Greer. |
| an extendable shaft that comprises a bend collar is telescopic and rotatable about the plug up to 360°; | For the same reasons given with regard to claim 1[d] and 1[f], this limitation is met by Greer. |
| one or more outlet receptacles connected to the shaft that are selectively attachable to a position on a wall; | For the same reasons given with respect to claim 1[c] and 1[g], this limitation is met by Greer. |
| an interchangeable faceplate selectively attached with the one or more outlet receptacles; | Paragraph 30 of Greer teaches or suggests the use of different shapes of faceplates.<br><br>[0030]  FIG. 2 shows a number of different embodiments of the present invention. For example, the (2) access point may be of a different shape such as triangular or rounded to allow additional receptacles to be accessed. Additionally, FIG. 2 shows that the present invention is not limited to only electrical power outlets but also shows an embodiment using CAT5/USB electrical adaptors.<br><br>Greer ¶ 30.  Thus, Greer teaches or suggests the use of interchangeable faceplates selectively attached with the one or more receptacles. |
| an electrical cord portion positioned between the extendable shaft and the plug end; and | For the same reasons given with respect to claim 1[e], this limitation is met by Greer. |
| a device cradle that includes wireless charging technology configured to hold a device and facilitate charging the device. | Paragraph 30 of Greer teaches or suggests that other electrical charging technologies can be used:<br><br>[0030]  FIG. 2 shows a number of different embodiments of the present invention. For example, the (2) access point may be of a different shape such as triangular or rounded to allow additional receptacles to be accessed. Additionally, FIG. 2 shows that the present invention is not limited to only electrical power outlets but also shows an embodiment using CAT5/USB electrical adaptors.<br><br>Greer ¶ 30.  Accordingly, it would have been obvious to include a wireless charging capability in the device of Greer, which would have necessarily included a "device cradle" to achieve the requisite proximity for such wireless |

14

| '158 Patent – Claim Language | Greer and Rohmer |
|---|---|
| | charging. This is especially true in view of, for example, U.S. Patent Publication No. 2019/0027953 to Rohmer, published January 24, 2019, which (as shown below in Fig. 1A and Fig. 1C) and discloses the use of such wireless charging cradles in connection with wall outlets: <br><br> FIG. 1A <br><br> FIG. 1C <br><br> The use of this technique at the outlet end of Greer would have been obvious. |

Defendants reserve the right to further develop these theories of obviousness, including by presenting expert testimony in support of the obviousness of claims of the '158 Patent, should the need arise outside the context of a preliminary injunction hearing request based on patents that are plainly not infringed.

**B. Plaintiff Cannot Show a Likelihood of Success on Its Lanham Act Claim Against the Appearing Defendants.**

Plaintiff bears the burden of making a "clear showing" of likelihood of success, and on an *ex parte* application that burden is, if anything, heightened: relief granted without an adversary's participation "should be restricted to serving [its] underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974). Now that the Appearing Defendants have appeared, the *ex parte* record cannot be carried forward into a preliminary injunction. On the merits, Plaintiff cannot satisfy the elements of a false-advertising claim as to *any* Appearing Defendant.

At the threshold, three of Plaintiff's four Lanham Act theories are not even asserted against the Appearing Defendants. Plaintiff's own Complaint names defendants count-by-count, and the Appearing Defendants -- Casesmile (No. 11), Haodsso Direct (No. 27), Yueshao (No. 76), and Beeyong (No. 116) -- appear *only* in **Count II, the UL theory**. They are not named in Count I (use of Plaintiff's images), which lists only Defendant Nos. 5, 13, 14, 20, 23, 24, 28, 39, 40, 41, 55, 60, 74, 77, 79, 80, 83, 87, 92, 93, 94, 96, 105, 107, 117, 122, 129, and 136; nor in Count III (ETL certification); nor in Count IV (grounding), which lists only Defendant Nos. 43, 54, 69, 118, 127, and 132. Compl., Counts I–IV. Because Plaintiff did not plead the image, ETL, or grounding theories against the Appearing Defendants, those theories cannot support a

preliminary injunction against them, and the analysis reduces to the single theory Plaintiff actually asserts -- the UL theory in Count II.

A Section 43(a) false-advertising plaintiff must establish five elements: (1) that the defendant made false or misleading statements about its own or another's product; (2) actual deception or a tendency to deceive a substantial portion of the intended audience; (3) materiality; (4) that the goods traveled in interstate commerce; and (5) a likelihood of injury to the plaintiff from the diversion of sales or loss of goodwill. *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011); *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 198 (3d Cir. 2014).

The first element divides into two paths. A claim is *literally* false only where it conveys an "unambiguous" message that is in fact false, *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586–87 (3d Cir. 2002). Conversely, a claim that is true or ambiguous on its face is actionable only as *impliedly* false, and "implied" falsity must be proven with extrinsic evidence -- ordinarily consumer surveys -- of how the audience actually understands the message. *Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 228–29 (3d Cir. 1990).

Recognizing they lack the requisite extrinsic evidence, Plaintiff attempts to bypass the survey requirement by pleading that their UL and grounding theories are conveyed "by necessary implication." Mem. at 33. However, under Third Circuit law, a message conveyed by necessary implication can only constitute literal falsity if the message is entirely unambiguous. *Groupe SEB*, 774 F.3d at 198 ("Unless the claim is unambiguous, however, it cannot be literally false."); *Novartis*, 290 F.3d at 587. Plaintiff's theories require impermissible logical leaps and consumer integration to reach their desired conclusion, rendering the challenged statements inherently

ambiguous. Consequently, Plaintiff's claims sound strictly in implied falsity. Because Plaintiff offers no survey or other extrinsic proof of consumer understanding, their claim fails as a matter of law.

The literal-falsity presumption of deception that Plaintiff invokes, *see* Mem. at 36, is therefore unavailable on this record for two reasons: it attaches *only* after the plaintiff proves the challenged statement was actually made and is unambiguously false, *Novartis*, 290 F.3d at 586–87, and it does not apply at all to claims of implied falsity, *Sandoz*, 902 F.2d at 228–29. Plaintiff cannot clear either hurdle against any Appearing Defendant.

Plaintiff also cannot establish the fifth element -- injury proximately caused by *these* defendants. To come within the Lanham Act's false-advertising cause of action, a plaintiff must plead and prove an injury to a commercial interest in sales or business reputation that was *proximately caused* by the defendant's misrepresentations. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129–40 (2014). Proximate cause cannot be shown on a record that never connects any representation to any particular seller. Plaintiff has lumped 136 unrelated sellers together and asks the Court to infer that each one caused it the same injury -- the very kind of attenuated, undifferentiated causal theory *Lexmark* forecloses. The failure of proof on causation is independently fatal to likelihood of success.

### 1. Accusation One (Use of Plaintiff's Images): Is Not Asserted Against the Appearing Defendants.

Count I is not pleaded against any Appearing Defendant. *See* Compl., Count I (naming other defendants only). It therefore cannot support an injunction against them.

### 2. Accusation Two ("Entirety" Complies with UL): Plaintiff Has Not Carried Its Burden as to These Sellers' Products, and Its Implied-Falsity Theory Requires Extrinsic Evidence It Has Not Offered.

Plaintiff's second theory is that the UL mark on the plug falsely tells consumers that the

"entirety" of the device is UL certified when only the plug "pigtail" is. Mem. at 35. That theory cannot support a preliminary injunction against the Appearing Defendants, because Plaintiff has not carried its burden of proof as to their products and because the theory is one of implied falsity for which Plaintiff has offered no extrinsic evidence.

Appearing Defendants never used the UL certification mark on their webpages or products. Plaintiff bears the burden of a "clear showing" as to each seller it seeks to enjoin, and it has come forward with no evidence about the Appearing Defendants' products. The Odell Declaration sorts the accused goods into anonymous "types" and never identifies which seller sold which device, never attaches any Appearing Defendant's listing or packaging, and never ties any specific UL marking to any Appearing Defendant. Odell Decl. ¶¶ 6–9. A movant cannot establish a likelihood of success on a UL-marking theory against a particular seller without evidence about that seller's product, and Plaintiff has offered none.

### 3. Accusation Three (ETL Certification): Is Not Asserted Against the Appearing Defendants.

Count III is not pleaded against any Appearing Defendant. *See* Compl., Count III (naming other defendants only). It therefore cannot support an injunction against them. In any event, Plaintiff's own CEO declares that "Toka places" the "ETL" certification mark "onto each of its *EZ OUTLET®* outlet extenders" -- confirming the ETL certification mark is Plaintiff's own, not a claim made by the Appearing Defendants. Joynt Decl. ¶ 17.

### 4. Accusation Four (Functional Grounded Plug):  Is Not Asserted Against the Appearing Defendants.

Count IV -- the grounding theory -- is pleaded against only six defendants: Nos. 43, 54, 69, 118, 127, and 132. Compl., Count IV. None of the Appearing Defendants is among them. Plaintiff therefore did not allege that any Appearing Defendant sells an ungrounded product, and

the grounding theory cannot support a preliminary injunction against them.

### 5. The Group-Pleading Defect Is Independently Fatal.

Each theory above fails for the same structural reason: Plaintiff seeks to enjoin 136 separate sellers on a record that never connects any challenged representation to any particular defendant. A preliminary injunction must be supported by a "clear showing" as to the party to be enjoined, *Reilly*, 858 F.3d at 176, and findings of likelihood of success cannot rest on undifferentiated, collective allegations. Plaintiff's reliance on a five-page declaration that lumps all defendants together and admits it did not test all of them cannot carry that burden as to the Appearing Defendants.

### 6. Count V (Common Law) Adds Nothing, Because It Is Derivative of the Federal Counts.

Although Count V (common law unfair competition) is pleaded against "all Defendants," it cannot independently support an injunction against the Appearing Defendants. Count V rests on the same conduct as the federal counts: it alleges that defendants infringed Plaintiff's design and "made literally false representations about the characteristics and/or qualities of their products." Compl. ¶ 93. Pennsylvania common-law unfair competition tracks the federal standard and reaches "acts or practices that are actionable under federal or state statutes." *Id.* ¶ 92. Because the image, ETL, and grounding theories are not pleaded against the Appearing Defendants, and because the UL theory fails for the reasons above, Count V fails with them as to these defendants. A derivative common-law claim cannot succeed where the federal theories it mirrors do not.

## C. Plaintiff Cannot Show Irreparable Harm, and the Asset Freeze Is Independently Improper.

### 1. Loss Compensable in Money Is Not Irreparable Harm.

Plaintiff's asserted injuries -- lost sales, price erosion, and lost goodwill from competition

by lower-priced sellers -- are quintessentially economic. To establish irreparable harm, a movant must show "potential harm which cannot be redressed by a legal or an equitable remedy following a trial," and an injury that can be compensated by money damages is not irreparable. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). Plaintiff's own theory -- that each of the Appearing Defendants' sales "directly displaces a sale of Plaintiff's" product, Mem. at 38 -- describes a calculable loss of sales, not an irreparable one.

Plaintiff cannot fill that gap with a presumption. Even if Plaintiff could invoke the rebuttable presumption recognized by 15 U.S.C. § 1116(a), that presumption does not relieve it of the ultimate burden of proving likely irreparable harm. *See Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 185–87 (3d Cir. 2022). The presumption is a procedural device, not a substitute for proof: it shifts only the burden of production, and it dissolves the moment a defendant introduces evidence from which a reasonable factfinder could conclude that irreparable harm is unlikely. *Id*. at 186. Once rebutted, the presumption "has no further effect," and the burden returns to Plaintiff to establish likely irreparable harm on the record as a whole. *Id.* at 186–87.

Here, the presumption never gets off the ground, because Plaintiff's own evidence rebuts it. Irreparable harm in a false-certification case is supposed to flow from consumer deception--the premise being that purchasers were misled by an unauthorized "UL" or "ETL" mark and that the resulting confusion erodes the certifier's goodwill. But Plaintiff's own evidence shows that the Appearing Defendants' product pages displayed no "UL" or "ETL" certification marks at all. The consumer who viewed those listings was therefore never presented with the misrepresentation on which Plaintiff's theory of harm depends. Plaintiff cannot simultaneously concede that the offending marks were absent from the point of sale and maintain that those

same marks deceived consumers and inflicted irreparable injury. The causal chain Plaintiff must prove—false mark, consumer confusion, injury to the certifier—is broken at its first link.

That evidentiary failure is only compounded by what Plaintiff has not offered. Plaintiff presents no declining-sales data, no evidence of diverted customers, no proof of reputational injury, and nothing tying any cognizable harm to any individual Appearing Defendant. Instead, Plaintiff rests on generalized assertions leveled collectively against 136 unrelated sellers. Where a plaintiff's own proof negates the predicate for its harm theory as to the Appearing Defendants, and where the remaining showing is untethered to any specific defendant, the § 1116(a) presumption is rebutted and unrevived. Plaintiff has not carried, and on this record cannot carry, its burden of demonstrating likely irreparable harm.

Irreparable harm must be *likely* and must flow from the conduct sought to be enjoined; a movant cannot show it by pointing to the defendant group as a whole. Plaintiff's evidence does not identify which seller sold which product, does not attach any Appearing Defendant's listing, and offers no figure for sales, diverted customers, or lost goodwill attributable to Casesmile, Haodsso Direct, Yueshao, or Beeyong. Having sorted the accused goods into anonymous "types" and declined to tie any "type" to any seller, *see* Odell Decl. ¶¶ 6–9, Plaintiff has no basis to claim that any Appearing Defendant is causing it harm at all, let alone harm so imminent and irreparable that it justifies freezing their businesses before a hearing. A theory of injury that cannot be traced to the party to be enjoined is not a showing of irreparable harm as to that party.

The absence of evidence is particularly significant because irreparable harm cannot rest on speculation. In *Ferring*, the Third Circuit affirmed the denial of a Lanham Act preliminary injunction where the movant relied on speculation that physicians would be less likely to prescribe its product, but offered no evidence that anyone had actually changed behavior because

of the challenged statements. *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 219 (3d Cir. 2014). Plaintiff's showing here is weaker still. It offers no evidence connecting any Appearing Defendant to any accused product, any diverted customer, any lost sale, or any reputational injury. Under *Winter*, a movant must show that irreparable injury is likely, not merely possible. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A preliminary injunction based only on a "possibility of irreparable harm" is improper. *Id*. Plaintiff has not shown that any alleged harm is traceable to these Defendants, much less that such harm is likely.

The burden is heavier still because the relief Plaintiff seeks does not preserve the status quo -- it perpetuates a freeze that has already shuttered the Appearing Defendants' storefronts and sequestered their funds and inventory. A preliminary injunction that would *alter* the status quo in this way subjects the movant to "a particularly heavy burden in demonstrating its necessity." *Ferring*, 765 F.3d at 219 n.13 (*quoting Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994)). Plaintiff cannot meet the ordinary irreparable-harm standard as to these sellers, let alone the heightened one that its continued, business-ending restraint demands.

### 2.   *Plaintiff's Delay Negates Any Claim of Urgency.*

Plaintiff has known of the Appearing Defendants -- their identities, their counsel, and their listings -- since 2025, when the same sellers appeared before this Court in the 593 Action. *See* 593 Action, Docs. 66, 73. Yet Plaintiff did not file its *ex parte* application in this action until March 2026, and the TRO did not issue until May 27, 2026 (Doc. 23). A plaintiff's "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief." *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985). Delay of this kind is strong evidence that the claimed harm is neither immediate nor irreparable.

**D. The Balance of Equities and the Public Interest Favor the Appearing Defendants.**

The freeze has shuttered the storefronts and frozen the operating funds of the Appearing Defendants based on evidence that does not concern their products. The harm to a lawful business from a wrongful freeze of its accounts and inventory is severe and ongoing, while Plaintiff faces only a delay in a money recovery it can pursue at trial. The public interest is not served by enjoining sellers on theories Plaintiff did not plead against them and did not support with any evidence about their products; it is disserved by an injunction that removes goods from the market on a mistaken evidentiary premise.

The imbalance is acute. A frozen storefront does not merely lose sales during the freeze; it loses search ranking, customer reviews, Prime eligibility, and seller standing that may never be recovered, and its inventory sits sequestered and unsalable. Those harms fall on sellers whom the record shows did nothing alleged in the motion. Against that, Plaintiff has identified no harm that a damages award after trial could not cure. Where, as here, the movant's likelihood of success is weak and its irreparable-harm showing absent, the balance of equities and the public interest both counsel strongly against continuing the extraordinary relief of an asset freeze. *Cf. Reilly*, 858 F.3d at 179 (movant who fails the gateway factors is not entitled to relief). The public's interest in honest advertising is fully served by requiring Plaintiff to prove its claims against each seller before that seller's goods are removed from the market; it is undermined by an order that, on this record, suppresses lawful competition.

## V. THE WRONGFUL RESTRAINT IS CAUSING COMPENSABLE HARM, AND THE $5,000 BOND IS MANIFESTLY INADEQUATE

Because the restraint should not have issued against the Appearing Defendants, the Court should also address the security that protects them from its consequences. Rule 65(c) permits

preliminary relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The bond is not a formality; in this Circuit it is the *source* and, ordinarily, the *ceiling* of a wrongfully restrained party's recovery. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 803–05 (3d Cir. 1989) (a wrongfully enjoined party's recovery is generally limited to the amount of the bond, and the failure to require an adequate bond is reversible error).

The harm here is real and accruing daily. The Order froze the Appearing Defendants' marketplace storefronts and all funds in their associated accounts, and directed marketplaces to cease fulfillment and sequester their inventory. *See* Order ¶¶ I.A(7)–(10), I.B. For a live e-commerce business, that is not a pause; it is the loss of active sales, the forfeiture of search ranking and "Prime" standing, the accumulation of storage and capital costs on sequestered inventory, the disruption of customer relationships and reviews, and the risk of permanent account deactivation -- harms that, as set out above, fall on sellers the record does not tie to the conduct alleged. These costs and damages are precisely what Rule 65(c) security exists to cover.

Yet the Court set security at only $5,000 for all 136 defendants combined. *See* Order ¶ IV. That figure cannot rationally approximate the costs and damages of freezing the businesses and inventory of the Appearing Defendants alone, let alone the entire defendant group. A $5,000 bond spread across 136 frozen storefronts is a small fraction of what a single seller stands to lose while its account and inventory remain locked through a preliminary-injunction determination. Because recovery is generally capped at the bond, an inadequate bond does not merely understate the security -- it threatens to leave the Appearing Defendants without a meaningful remedy for a restraint that should not have issued against them. *Instant Air Freight*, 882 F.2d at

804–05.

Accordingly, if any restraint is to continue against the Appearing Defendants pending the preliminary-injunction determination -- which, for the reasons above, it should not -- the Court should substantially increase the Rule 65(c) security to an amount that realistically reflects the costs and damages the Appearing Defendants will sustain, and should permit expedited proof of those damages. The Appearing Defendants further reserve their right to recover their costs and damages caused by the wrongful restraint, against the bond and to the full extent the law allows, upon a determination that they were wrongfully restrained.

## VI. CONCLUSION

For the foregoing reasons, the Appearing Defendants respectfully request that the Court (1) decline to enter a preliminary injunction against Casesmile, Haodsso Direct, Yueshao, and Beeyong; (2) dissolve the asset and storefront restraints as to the Appearing Defendants; and (3) to the extent any restraint continues against the Appearing Defendants, substantially increase the Rule 65(c) security to an amount adequate to cover the costs and damages they will sustain. The patent infringement claims provide no separate basis for relief either: because the accused products do not infringe the '758 or '158 patents and both patents are of dubious validity, Plaintiff cannot show that its infringement claims will likely withstand the Appearing Defendants' invalidity defense, and the injunction must be denied on that ground as well.

The questions surrounding the manner in which Plaintiff obtained this relief are the subject of the Appearing Defendants' separately filed Motion for an Order to Show Cause and for Sanctions (Dkt. 35), and the Appearing Defendants reserve all rights to recover their damages from the wrongful restraint by appropriate motion. The Appearing Defendants further request such other relief as the Court deems just.

.

Respectfully submitted,

/s/ Ruoting Men
Ruoting Men, Esq.
GLACIER LAW LLP
506 Second Avenue, Suite 1516
Seattle, WA 98104
Tel: (212) 729-5049
ruoting.men@glacier.law

Counsel for the Appearing Defendants

**CERTIFICATE OF SERVICE**

I certify that on June 16, 2026, the foregoing was filed with the Clerk of Court via the

CM/ECF system, which will serve notice on all counsel of record.

/s/ Ruoting Men
Ruoting Men
